UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


THE MEADOWS AT MAINSTONE
FARM CONDOMINIUM TRUST,
    Plaintiff,


    v.                          CIVIL ACTION NO.
                                    16-12546-MBB


STRATHMORE INSURANCE COMPANY,
    Defendant.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT STRATHMORE INSURANCE COMPANY'S MOTION TO STRIKE EXPERT**
**OPINION (DOCKET ENTRY # 26); MOTION FOR SUMMARY JUDGMENT (DOCKET**
**ENTRY # 28); PLAINTIFF THE MEADOWS AT MAINSTONE FARM CONDOMINIUM**
**TRUST'S MOTION FOR LEAVE TO AMEND COMPLAINT (DOCKET ENTRY # 36)**

**September 28, 2018**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion to strike an expert
opinion and a motion for summary judgment filed by defendant
Strathmore Insurance Company ("defendant") as well as a motion
for leave to amend the complaint filed by plaintiff The Meadows
at Mainstone Farm Condominium Trust ("plaintiff"). (Docket
Entry ## 26, 28, 36). After conducting a hearing, this court
took the motions under advisement.

<u>PROCEDURAL BACKGROUND</u>

    On December 17, 2016, plaintiff, a condominium trust, filed
a two-count complaint against defendant, setting out a claim for
breach of contract (Count I) and seeking a declaratory judgment

(Count II).  (Docket Entry # 1).  With respect to Count I, the complaint requests judgment against defendant in the amount of plaintiff's damages, including interest and costs.  (Docket Entry # 1).  With respect to Count II, the complaint requests that this court declare that all amounts expended to repair damage are covered by the insurance policy at issue and that plaintiff is entitled to interest and costs on said amount. (Docket Entry # 1).

On October 16, 2017, defendant filed the motion to strike the opinion of plaintiff's expert, Paul F. Amoruso, CPCU ("Amoruso"), which would be used to oppose defendant's upcoming motion for summary judgment.  (Docket Entry # 26).  Defendant filed the motion to strike on the grounds that the expert opinion contains "inadmissible conclusions of law," and the expert's report "lacks any specialized knowledge" that would assist a trier of fact in understanding or determining a factual issue.  (Docket Entry # 26, p. 2).  The motion asks this court to strike Amoruso's expert report in its entirety, preclude the use of the opinions to oppose a future summary judgment motion by defendant, and preclude Amoruso from testifying at trial. (Docket Entry # 26).  Plaintiff argues that the motion to strike is deficient because it is premature, plaintiff gave "fair notice" to defendant about Amoruso's qualifications and opinions, and Amoruso's knowledge will assist a trier of fact in

understanding and applying the disputed insurance policy. (Docket Entry # 27, p. 2). Defendant also challenges the competency of Matthew D. Langweber ("Langweber"), a resident at The Meadows at Mainstone Farm condominium complex ("the Meadows"), to testify concerning the frequency of communication between plaintiff and defendant following the loss. (Docket Entry # 34-1, ¶ 32) (Docket Entry # 30-2, ¶ 1).

On October 31, 2017, defendant filed the summary judgment motion, asserting that the claims are time barred under both the statutory and the policy's limitations periods. (Docket Entry # 28). Defendant argues that under a two-year limitations period for covered losses under Massachusetts General Laws chapter 175, section 99 ("section 99"), the claims must have been filed by February 4, 2013 in order to be timely. (Docket Entry # 28). Plaintiff submits that the contractual two-year limitations period does not bar the claims for the type of loss at issue. (Docket Entry # 30). Plaintiff also contends that defendant waived or is estopped from raising the contractual limitations period. (Docket Entry # 30).

In January 2018, plaintiff filed the motion for leave to amend the complaint. (Docket Entry # 36). Plaintiff seeks to amend the original complaint by adding claims for: (1) violation of Massachusetts General Laws chapter 176D ("chapter 176D") (Count III); and (2) violation of Massachusetts General

Laws chapter 93A ("chapter 93A") (Count IV). (Docket Entry # 36-1). In opposing the motion, defendant contends that the proposed amendment is "futile, untimely, and prejudicial." (Docket Entry # 38, p. 1).

I.  Defendant's Motion for Summary Judgment

FACTUAL BACKGROUND

Effective as of May 28, 2010, defendant issued an insurance policy ("the policy") for general commercial property liability coverage to plaintiff for the period of May 28, 2010 to May 28, 2011. (Docket Entry # 1, ¶ 2) (Docket Entry # 6, ¶ 2) (Docket Entry # 28-2, ¶ 1) (Docket Entry # 31, ¶¶ 1, 20) (Docket Entry # 34-1, ¶ 20) (Docket Entry # 28-4). The policy combines a variety of different coverages including, at plaintiff's request, a "Standard Massachusetts Fire Policy endorsement." (Docket Entry # 34-1, ¶ 21). Endorsement CP 01 09 10-00 adds standard Massachusetts fire policy provisions which, in pertinent part, include the following:

> Your policy contains Legal Actions Against Us, Appraisal and Cancellation Provisions. Massachusetts law requires that the Suit, Appraisal and Cancellation Provisions of the Massachusetts Standard Fire Policy supersede any similar provisions contained in your policy. Therefore, all Legal Action Against Us, Appraisal and Cancellation Provisions contained *in your policy are void*. The Suit, Appraisal and Cancellation Provisions of the Massachusetts Standard Fire Policy *shall apply instead*.

(Docket Entry # 28-4, p. 107, ¶ 1) (emphasis added). The endorsement further provides that:

> . . . No suit or action against this company for the
> recovery of any claim by virtue of this policy shall be
> sustained in any court of law or equity in this
> commonwealth unless commenced within two years *from the
> time the loss occurred*[.]

(Docket Entry # 28-4, p. 110) (emphasis added). In addition to
the Standard Massachusetts Fire Policy endorsement, the policy
contains language that prevents an individual from bringing
legal action against defendant under the policy unless "[t]he
action is brought within 2 years after the date on which the
direct physical loss or damage occurred." (Docket Entry # 28-2,
¶ 8) (Docket Entry # 31, ¶ 18) (Docket Entry # 28-4, p. 102).

On February 4, 2011, a series of water intrusions from
melting ice and snow caused interior damage to the ceiling,
walls, and flooring inside plaintiff's buildings ("interior
damage"). (Docket Entry # 28-2, ¶ 3) (Docket Entry # 31, ¶ 3).
Three days later, on February 7, 2011, plaintiff notified
defendant of an insurance claim arising from the flooding.
(Docket Entry # 28-2, ¶ 2) (Docket Entry # 31, ¶ 2). In March
2011, plaintiff hired Criterium Turner Engineers as an expert
consultant to assess the damage. (Docket Entry # 28-2, ¶ 5)
(Docket Entry # 31, ¶ 5) (Docket Entry # 30-2, ¶ 3) (Docket
Entry # 30-3, ¶ 3).[1] In July 2011, defendant made payments to
plaintiff in order to rectify the interior damage resulting from

---

[1] See the next two footnotes.

the water intrusion and closed the claim. (Docket Entry # 28-2, ¶ 4) (Docket Entry # 31, ¶ 4).[2] The interior damage is not at issue in this litigation. (Docket Entry # 28-2, ¶ 4) (Docket Entry # 31, ¶ 4).

After July 2011, plaintiff hired additional outside consultants to determine whether the water intrusions caused damage to the exterior walls, roofs, and siding of the condominium units ("exterior damage").[3] (Docket Entry # 30-2, ¶ 3) (Docket Entry # 30-3, ¶ 3) (Docket Entry # 28-2, ¶ 5) (Docket Entry # 31, ¶ 5).[4] In September 2011, October 2011, March 2012, and June 2012, plaintiff hired and consulted with expert

_____

[2] Plaintiff does not controvert defendant's LR. 56.1 statement that defendant made the payments on the claim for interior damage and closed the claim on or about July 2011. (Docket Entry # 31, ¶ 4); see Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003); Stonkus v. City of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted the undisputed material facts that the plaintiff failed to controvert).
[3] Documents in the record also refer to the claim for exterior damage as the supplemental claim.
[4] Plaintiff's LR. 56.1 response does not controvert the dates in defendant's LR. 56.1 statement. (Docket Entry # 28-2, ¶ 5) (Docket Entry # 31, ¶ 5); see Cochran v. Quest Software, Inc., 328 F.3d at 12 (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment). In addition, even if plaintiff hired the expert consultants to assess the damage in general, as opposed to damage specific to the exterior, such experts and, by extension, plaintiff should have uncovered the exterior damage to the walls, roofs, and siding resulting from ice dams or other damages caused by the February 2011 storm prior to the production and communication of their expert reports to plaintiff.

consultants to investigate the matter. (Docket Entry # 30-2, ¶ 3) (Docket Entry # 30-3, ¶ 3) (Docket Entry # 28-2, ¶ 5) (Docket Entry # 31, ¶ 5).[5] After receiving reports from its expert consultants after September 1, 2012, plaintiff estimated the repair costs for the exterior damage to be seven million dollars. (Docket Entry # 30-2, ¶ 3) (Docket Entry # 30-3, ¶ 3). By January 31, 2013, the expert consulting firm plaintiff hired in October 2011 expressed the belief "that 'there is some damage that they will be able to positively identify that reflates to ice dams.'" (Docker Entry # 28-2, ¶ 5) (Docket Entry # 31, ¶ 5).[6] It is the policy's coverage, if any, for this exterior damage to the external structure of the condominium units that forms the central issue of this case.[7]

---

[5] See the previous footnote. Plaintiff does not controvert the dates or that it began consulting with these expert consultants.
[6] Plaintiff's response does not controvert this statement in paragraph five of defendant's LR. 56.1 statement.
[7] Plaintiff describes this exterior damage as "[c]oncealed [d]amage" that was not entirely uncovered until it acquired expert damage reports after September 1, 2012. (Docket Entry # 31, ¶ 30). Defendant denies the characterization of the damage as "concealed." (Docket Entry # 34-1, ¶ 29). It repeatedly argues that that "[n]othing magical happened after September 1, 2012" that would have notified plaintiff of the true extent of the exterior damage beyond what it already knew as early as February 2011, immediately following the flooding events, or as late as July 2012, when it last hired an expert consultant. (Docket Entry # 34-1, ¶¶ 29, 30). Denying the concealed nature of the exterior damage, defendant argues that the policy should not cover it. (Docket Entry # 28-1) (Docket Entry # 34-1, ¶¶ 29, 41).

On January 31, 2013, Jeff Grosser ("Grosser"), vice president of Rodman Insurance Agency ("Rodman"), defendant's local insurance agent,[8] emailed David Barrett of Crowninshield Management Corporation ("Crowninshield"), plaintiff's property management company. (Docket Entry # 28-2, ¶ 6) (Docket Entry # 31, ¶ 6). Correspondence from Rodman to Cronwinshield states the following: "'Confirming that you did inquire about the merits of filing a supplemental claim related to the large ice dam loss because the contractor has indicated that there may be additional damage resulting from that loss.'" (Docket Entry # 28-6).

On April 2, 2013, David Barrett ("Barrett") of Crowninshield sent additional communication to Debbie Morda and Grosser of Rodman stating: "'The board would like to investigate opening up a supplemental claim associated with a prior ice dam claim.'" (Docket Entry # 28-2, ¶ 8) (Docket Entry # 31, ¶ 8) (Docket Entry # 28-7). The email also requested contact with a Rodman insurance adjustor. (Docket Entry # 28-2, ¶ 8) (Docket Entry # 31, ¶ 8) (Docket Entry # 28-7).

---

[8] The parties dispute whether Rodman is plaintiff's or defendant's local insurance agent. (Docket Entry # 28-2, ¶ 6) (Docket Entry # 31, ¶ 6). Langweber, a resident of The Meadows at Mainstone Farm who attests he has personal knowledge of the matter, avers by affidavit that Rodman is defendant's local insurance agent. (Docket Entry # 30-2, ¶ 4). Construing the record in plaintiff's favor, this court considers Rodman to be defendant's local insurance agent. (Docket Entry # 30-2, ¶ 4).

The following day, April 3, 2013, Christine Nemet ("Nemet") of Rodman forwarded Barrett's April 2 email to Michael Kearney ("Kearney"), an adjuster at LaMarche Associates, Inc. ("LaMarche"). (Docket Entry # 28-2, ¶ 9) (Docket Entry 31, ¶ 9) (Docket Entry # 28-8, p. 2). LaMarche is an independent insurance adjustor that defendant had previously retained to evaluate and adjust the interior damages resulting from the flooding. (Docket Entry # 28-2, ¶ 9) (Docket Entry # 31, ¶ 9). In an April 3, 2013 reply email to Nemet, Kearney states that, "'the two-year statute has expired on this claim that occurred in February 4, 2011.'" (Docket Entry # 28-2, ¶ 9) (Docket Entry # 31, ¶ 9) (Docket Entry # 28-8). Notably, Kearney also sent this email to Barrett and to John Auli ("Auli"), plaintiff's senior claims examiner. (Docket Entry # 28-8). In an email less than two hours later, Nemet asked Kearney to revisit the question of whether the statute of limitations had expired on claims arising from the exterior damage and that she needed "Greater New York" ("GNY") "to authorize this supplemental." (Docket Entry # 28-2, ¶ 9) (Docket Entry # 31, ¶ 9) (Docket Entry # 30-2, p. 5). Nemet's email also forwarded Rodman's January 31, 2013 email, which Nemet describes as "confirming there is a possible supplemental claim" sent "before the statute was up." (Docket Entry # 28-2, ¶ 9) (Docket Entry # 31, ¶ 9) (Docket Entry # 30-2, p. 5).

Later that morning, Steven Baroncini ("Baroncini"), defendant's vice president of property claims, sent a communication to Nemet at Rodman and Kearney at LaMarche further discussing the expiration of the limitations period.[9]  (Docket Entry # 30-2, p. 5).  Baroncini's email states that "[t]he suit limitation has passed, but that does not preclude the insured from reporting a supplement to their claim."  (Docket Entry # 30-2, p. 5).

On April 4, 2013, LaMarche, writing on defendant's behalf, sent a reservation of rights letter to plaintiff in care of Crowninshield and to the attention of Barrett.  (Docket Entry # 28-9) (Docket Entry # 28-2, ¶ 10) (Docket Entry # 31, ¶ 10).  While the letter acknowledges that defendant would be "investigating . . . the supplemental claim," it also states defendant's intention to proceed with the investigation under a full reservation of rights.  (Docket Entry # 28-9).  The letter informs plaintiff that, "None of [defendant's] activities to date are to be construed as an admission of liability nor as a waiver of any of the rights or defenses available under the terms and conditions of the policy, all of which are hereby reserved."[10]  (Docket Entry # 28-9).

---

[9]  Nemet included Baroncini as a recipient of this email to Kearney.  (Docket Entry # 30-2, p. 5).
[10]  Langweber avers in an affidavit that "at all times," plaintiff was "in frequent communication" with Rodman.  (Docket

On or about August 8, 2013, defendant wrote to plaintiff to explain defendant's coverage position relative to plaintiff's supplemental claim. (Docket Entry # 28-2, ¶ 12) (Docket Entry # 31, ¶ 12). Denying coverage for the supplemental claim, the correspondence restated the terms set forth in the insurance policy including that: "no one may bring legal action against the insurance company unless: 1. There has been full compliance with all the terms of this coverage part; and 2. The action is brought within two years after the date on which the direct physical loss or damage occurred." (Docket Entry # 28-2, ¶ 12) (Docket Entry # 31, ¶ 12) (Docket Entry # 28-10, p. 4). Following this denial of coverage, plaintiff retained counsel to assist with the supplemental claim. (Docket Entry # 31, ¶ 34) (Docket Entry # 34-1, ¶ 34). On December 19, 2013, Barrett responded to defendant's coverage position on plaintiff's behalf, advising that plaintiff "does not accept the findings in

---

Entry # 30-2, ¶ 4). Defendant objects to the averment as a "broad and vague characterization" and that Langweber's lack of personal knowledge concerning the alleged frequency of communication between the two parties renders his testimony "not competent." (Docket Entry # 34-1, ¶ 32). The above emails set out the written communication in and around early 2013. Even accepting Langberger's averment as accurate (Docket Entry # 30-2, ¶ 4), it nevertheless does not provide a basis to show the timely *filing* of this lawsuit within two years of the date of loss under section 99, as explained in the discussion. Nor, in light of the repeated reservation of rights and statements denying the existence of an estoppel or waiver does this averment provide a basis for waiver or estoppel.

the rejection letter," and that it would provide additional information on the claim.  (Docket Entry # 28-2, ¶ 13) (Docket Entry # 31, ¶ 13) (Docket Entry # 28-11).

On May 30, 2014, Richard E. Quinby, Esq. ("Quinby"), plaintiff's counsel at the time, sent a letter to Auli requesting a reconsideration of the coverage denial made last year.  (Docket Entry # 28-12).  The letter asserts that various consultants advised plaintiff in "late 2012 or early 2013" that "there may be water penetration" to "the building envelope." (Docket Entry # 28-12).  The letter estimates the total cost of repair "to be $7.75 million."  (Docket Entry # 28-12). Acknowledging that defendant already made payments to repair the interior damage, the letter re-asserts plaintiff's position that the exterior damage should also be covered.  (Docket Entry # 28-12).  The letter concludes that if defendant did not pursue mediation prior to June 9, 2014, plaintiff would "file the appropriate action."  (Docket Entry # 28-12).

After plaintiff's counsel asked defendant to reconsider the denial of coverage, defendant agreed to reconsider the denial. (Docket Entry # 30-2, ¶ 7) (Docket Entry # 30-3, ¶ 6) (Docket Entry # 34-1, ¶ 34).  On July 30, 2014, defendant "through its coverage counsel sent a demand for examination under oath and request for production of documents."  (Docket Entry # 28-2, ¶ 19) (Docket Entry # 31, ¶ 19) (Docket Entry # 28-15).  In this

letter, defendant reiterated its reservation of rights, including the right to assert a statute of limitations defense. (Docket Entry # 28-15, p. 3). The letter sets forth the reservation of rights in the following manner:

> This reservation includes, but is not limited to, reservation of its rights to continue to disclaim any obligations under this policy, if investigation of the circumstances surrounding this loss would so warrant, and to avail itself of any other policy defenses which it may have or which may arise including, without limitation, all rights and defenses arising out of the duties of the insured provisions and the exclusionary provisions.
>
> Any and all investigations taken by Strathmore . . . shall not constitute a waiver of, or an estoppel to assert, any of the terms of the policy . . . or any rights or defenses . . ., including . . . limitations of actions . . ..

(Docket Entry # 28-15, p. 3). In addition to the reservation of rights, the letter requests that plaintiff provide additional information. (Docket Entry # 31, ¶ 36) (Docket Entry # 34-1, ¶ 36). Plaintiff provided certain additional information and produced two witnesses who made statements under oath. (Docket Entry # 31, ¶ 36) (Docket Entry # 34-1, ¶ 36).

During defendant's investigation of the claim for exterior damage, Quinby, plaintiff's counsel at the time, interacted with defendant's counsel. Together with Langweber, Quinby gathered materials and produced documents requested by defendant's counsel. (Docket Entry # 30-3, ¶¶ 2, 10) (Docket Entry # 30-2, ¶ 8). Quinby avers that defendant's counsel "assured" him that defendant would "attempt to amicably resolve" the claim for

exterior damage after contemplating the investigation. (Docket Entry # 30-3, ¶ 9).

In an email on August 13, 2014 to defendant's counsel, Quinby recounted his efforts to compile the documents and stated that he "can withhold bringing an action . . . if we can agree on a tolling agreement." (Docket Entry # 34-2, p. 4). In a reply email on September 5, 2014, defendant's counsel stated that "GNY would consider agreeing to" a tolling agreement "so long as the tolling agreement does not serve to *revive* any *expired* statute of limitations." (Docket Entry # 34-2, p. 3) (emphasis added). In a reply email two hours later, plaintiff's counsel stated he "agree[d] on the tolling agreement." (Docket Entry # 34-2, p. 3).

In December 2014, both parties entered into a tolling agreement ("Tolling Agreement") with an effective date "as of September 1, 2014." (Docket Entry # 28-2, ¶ 15) (Docket Entry # 31, ¶ 15) (Docket Entry # 28-13, pp. 1, 4). The pertinent parts, which appear in paragraphs two and four, are as follows:

> 2.) This Tolling Agreement will terminate 30 calendar days after Strathmore Insurance Company notifies in writing The Meadows at Mainstone Farm Condominium Trust of its decision related to the Supplemental Claim ("Termination Date").

> 4.) This Tolling Agreement shall not in any manner revive, resurrect, or create any claims, rights, causes of action or suits which have expired or are barred by any applicable statute of limitations or repose or other rule, provision, defense or principle based upon

>        the passage of time (including, without limitation,
>        *waiver, estoppel* and laches) whether statutory,
>        contractual or otherwise existing as of the Effective
>        Date or limit in any way the assertion of any defense
>        available as of the Effective Date related to the
>        Claim and Supplemental Claim.

(Docket Entry # 28-13, ¶¶ 2 & 4) (emphasis added).  In the

Tolling Agreement, the parties also agreed that the period from

the agreement's effective date (September 1, 2014) to its

termination date (30 days after defendant's coverage decision)

would not be "asserted or relied upon in any way to compute" the

running of the statute of limitations.  (Docket Entry # 28-13,

¶¶ 1, 2).[11]

     On or about November 17, 2016, defendant provided plaintiff

with a detailed basis for declining coverage for the

supplemental claim for exterior damage.  (Docket Entry # 28-2, ¶

16) (Docket Entry # 31, ¶ 16).  On December 17, 2016, in

response to its receipt of the letter declining claim coverage,

plaintiff filed this action.  (Docket Entry # 28-2, ¶ 17)

(Docket Entry # 31, ¶ 17).

STANDARD OF REVIEW

     Summary judgment is designed "'to pierce the boilerplate of

the pleadings and assay the parties' proof in order to determine

---

[11]   The Tolling Agreement therefore excluded from the limitations
period the time period of September 1, 2014 to December 17,
2016, which was 30 days after defendant's final coverage
decision on November 17, 2016.  (Docket Entry # 28-13, ¶¶ 1, 2).

whether trial is actually required.'" <u>Dávila v. Corporación De Puerto Rico Para La Difusión Pública</u>, 498 F.3d 9, 12 (1st Cir. 2007).  It is appropriate when the summary judgment record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Pierce v. Cotuit Fire Dist.</u>, 741 F.3d 295, 301 (1st Cir. 2014).

"An issue is 'genuine' when a rational factfinder could resolve it [in] either direction" and a "fact is 'material' when its (non)existence could change a case's outcome." <u>Mu v. Omni Hotels Mgmt. Corp.</u>, 882 F.3d 1, 5 (1st Cir. 2018); <u>accord</u> <u>Green Mountain Realty Corp. v. Leonard</u>, 750 F.3d 30, 38 (1st Cir. 2014).  Facts are viewed in favor of the non-movant, i.e., plaintiff.  <u>See</u> <u>Garcia-Garcia v. Costco Wholesale Corp.</u>, 878 F.3d 411, 417 (1st Cir. 2017) (court examines "'record in the light most favorable to the nonmovant' and must make 'all reasonable inferences in that party's favor'"); <u>Ahmed v. Johnson</u>, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine all of the record materials on file even if not cited by the parties.  Fed. R. Civ. P. 56(c)(3); <u>Geshke v. Crocs, Inc.</u>, 740 F.3d 74, 77 (1st Cir. 2014).  "'"[C]onclusory allegations, improbable inferences,

and unsupported speculation"'" are ignored. <u>Garcia-Garcia v.</u>
<u>Costo Wholesale Corp.</u>, 878 F.3d at 417.

With respect to a statute of limitations defense, summary
judgment is appropriate "where there is no dispute as to
essential evidentiary facts controlling the application of the
statute of limitations." <u>Nunheimer v. Continental Ins. Co.</u>, 68
F. Supp. 2d 75, 77 (D. Mass. 1999). As an affirmative defense,
"'the defendant bears the burden of establishing" the
applicability of the statute of limitations. <u>Asociación de</u>
<u>Suscripción Conjunta del Seguro de Responsabilidad Obligatorio</u>
<u>v. Juarbe-Jimenez</u>, 659 F.3d 42, 50 n.10 (1st Cir. 2011); <u>see</u>
Fed. R. Civ. P. 8(c). As explained by the court in <u>Asociación</u>
with respect to the statute of limitations:

> "The party who has the burden of proof on a dispositive
> issue cannot attain summary judgment unless the evidence he
> provides on that issue is *conclusive*." <u>Torres Vargas v.</u>
> <u>Santiago Cummings</u>, 149 F.3d 29, 36 (1st Cir. 1998)
> (internal citations omitted). Once the defendant produces
> such evidence, the burden shifts to the plaintiff to
> establish that the statute of limitations does not apply.

<u>Id.</u> (emphahsis added). Thus, if defendant provides evidence
that the statute of limitations conclusively applies, plaintiff
bears the burden to show that any tolling of the limitations
period "is within the range where reasonable men and women can
differ."[12] <u>Espada v. Lugo</u>, 312 F.3d 1, 4 (1st Cir. 2002) (noting

---

[12] As discussed below, tolling under the discovery rule does not
apply.

on summary that "plaintiff bears the burden of proving

timeliness by establishing that she lacked the necessary

knowledge or imputed knowledge before instituting the action");

Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 19 (1st

Cir. 2000).

DISCUSSION

A.   Breach of Contract

In Count I, plaintiff asserts that defendant's "failure to

honor its contractual obligations and failure to make payment on

the full amount of [p]laintiff's loss" under the policy

constitutes a breach of contract.  (Docket Entry # 1, ¶ 17).  In

light of defendant's refusal to cover the exterior damage,

plaintiff purportedly expended "in excess of seven million

dollars repairing the damage."  (Docket Entry # 1, ¶ 18).

In seeking summary judgment, defendant sets forth the

following arguments:  (1) the applicable limitations period

under the policy, which section 99 sets out by statute, is two

years from the time the loss occurred; (2) in Massachusetts, the

two-year limitations period in section 99 applies to all claims

for first-party property losses; (3) the discovery rule does not

apply; and (4) its actions have not waived the statute of

limitations or estopped it from asserting such a defense.

(Docket Entry # 28-1).  As such, plaintiff's failure to file

suit on or before February 4, 2013 forecloses its claims, according to defendant. (Docket Entry # 28-1).

In Massachusetts, section 99 sets out a standard form and content to include in property policies insuring against loss or damage by fire. Mass. Gen. Laws ch. 175, § 99. The language includes a two-year limitations period. Mass. Gen. Laws ch. 175, § 99. In accordance with section 99's requirements, plaintiff's policy with defendant contains the following provision:

> No suit or action against this company for the recovery of any claim by virtue of this policy shall be sustained in any court of law or equity in this commonwealth unless commenced *within two years from the time the loss occurred*[.]

(Docket Entry # 28-4, p. 110) (emphasis added); see Mass. Gen. Laws ch. 175, § 99 (containing same language). Plaintiff argues that the limitations language found in Massachusetts General Laws chapter 175, section 22 ("section 22") applies. In pertinent part, section 22 states that:

> No company and no officer or agent thereof shall make, issue or deliver any policy of insurance or any annuity or pure endowment contract containing any condition, stipulation or agreement . . . limiting the time for commencing actions against it to a period of less than *two years from the time when the cause of action accrues* . . .. Any such condition, stipulation or agreement shall be void.

Mass Gen. Laws ch. 175, § 22 (emphasis added). Plaintiff submits that section 22 voids the policy's limitations period, which wrongly "purports to shorten the time to bring suit to

less than the 'two years from the time when the cause of action accrues.'" (Docket Entry # 30, p. 7).

There are a number of Massachusetts cases in which plaintiffs use section 22 to challenge the validity of insurance policies that utilize section 99's limitations language. See Goldsmith v. Reliance Ins. Co., 228 N.E.2d 704, 706 (Mass. 1967); Rock of Salvation Pentecostal Church, Inc. v. Guideone Ins. Co., No. 0301382A, 2004 WL 856613, at *1, *6 (Mass. Super. Mar. 2, 2004). Most notably, in Goldsmith, the Massachusetts Supreme Judicial Court ("SJC") held that, contrary to the plaintiff's contention, section 22 did not void the section 99 limitations provision in a policy that insured a retail store against fire damage. Goldsmith v. Reliance Ins. Co., 228 N.E.2d at 706. The SJC noted that the section 99 language could remain effective by "confining § 22 to nonstatutory limitations, that is, to those settled upon solely by the parties to the insurance policy . . .." Id. Stated otherwise, if the insurance policy's limitations provision contains the precise statutory language from section 99, section 22 does not nullify it.[13] See id.

---

[13] Furthermore, Goldsmith distinguishes Barton, which also discussed the relationship between sections 99 and 22. Barton v. Automobile Ins. Co. of Hartford, Conn., 34 N.E.2d 516, 517 (Mass. 1941). Specifically, the Barton court held that "[u]nder our statutes no limitation can be made to run from the happening of the loss." Id. The key difference between the two cases lies in the fact that the Barton policy was "not in a standard form prescribed by statute," so the court did not have occasion

The court in _Faustman v. Commerce Ins. Co._ further develops _Goldsmith_ by confronting a similar issue, namely, "whether the inclusion of fire insurance with other types of coverage makes the entire policy subject to [section] 99, thereby avoiding the proscriptions of [section] 22." _Faustman v. Commerce Ins. Co._, No. 992303, 2000 WL 1473148, at *1, *2-4 (Mass. Super. Ct. July 5, 2000). Massachusetts General Laws chapter 175, section 54E ("section 54E"), authorizes the combining of fire insurance with other types of coverage in a homeowner's insurance policy upon obtaining approval from the Massachusetts Commissioner of Insurance ("the Insurance Commissioner"). Mass. Gen. Laws ch. 175, § 54E. In light of section 54E, the _Faustman_ court determined that the Massachusetts legislature likely intended section 99 to govern policies that obtained permission to combine fire insurance with a variety of other coverages. _Faustman v. Commerce Ins. Co._, 2000 WL 1473148, at *2-4. Because the plaintiff's policy combined this variety of different coverages and received approval from the Insurance Commissioner to do so, the policy's reliance on section 99 was appropriate. _Id._ The court therefore allowed summary judgment

---

to consider section 99's limitations clause. _Goldsmith v. Reliance Ins. Co._, 228 N.E.2d at 706 n.1. This distinction further supports the conclusion that a policy's limitations clause that directly follows section 99's standard, statutory form is valid. _See id._

by finding the insurance claim untimely because it filed the action after two years from the time the loss occurred.  Id.

The applicable limitations provision in the policy between plaintiff and defendant uses the precise statutory language of the limitations provision in section 99.  See Goldsmith v. Reliance Ins. Co., 228 N.E.2d at 706.  With the Insurance Commissioner's permission, the policy conforms a variety of different coverages and includes section 99's language.  (Docket Entry # 31, ¶ 21) (Docket Entry # 34-1, ¶ 21).  Section 54F explicitly permits commercial property insurance policies to write additional coverage protections into standard fire insurance policies with the Insurance Commissioner's permission.[14]  See Mass. Gen. Laws ch. 175, § 54F; Faustman v. Commerce Ins. Co., 2000 WL 1473148, at *2-4.  Because section 22 does not void limitations provisions that explicitly follow statutory guidelines, defendant's reliance on section 99 adheres to the legislative intent behind section 54F.  See Goldsmith v.

---

[14]  In the pertinent part, section 54F states:

> Any company authorized to insure against loss or damage by fire . . . may . . . insure against loss or damage to, or the legal liability of the insured with respect to, commercial property . . . provided, that insurance against loss or damage by perils other than the peril of fire may be written only when insurance against the peril of fire is written in the same policy and on forms which have been submitted to and approved by the commissioner.

Mass. Gen. Laws ch. 175, § 54F.

<u>Reliance Ins. Co.</u>, 228 N.E.2d at 706. Consistent with the <u>Goldsmith</u> and <u>Faustman</u> precedents, section 99 establishes the policy's limitations period at two years from the time the loss occurred.[15] <u>See</u> <u>id.</u>; <u>Faustman v. Commerce Ins. Co.</u>, 2000 WL 1473148, at *2-4.

Plaintiff next submits that because the exterior damage did not result from fire loss, the <u>Goldsmith</u> holding does not apply. (Docket Entry # 30). Plaintiff asserts that section 22 therefore governs the policy's limitations provision. (Docket Entry # 30). At the very least, plaintiff requests that, pursuant to SJC Rule 1:03, this court certify to the SJC the question of whether section 99 or section 22 governs non-fire "weather event loss claims." (Docket Entry # 30, p. 11) (capitalization omitted).

The argument fails to acknowledge that existing Massachusetts case law applies section 99 beyond the narrowly-defined scope of fire losses to a broad range of claims arising from non-fire damages. <u>See</u> <u>Nurse v. Omega U.S. Ins., Inc.</u>, 38

---

[15] To the extent plaintiff asserts that a six-year limitations applies under Massachusetts General Laws chapter 260, section two, because Count I constitutes a breach of contract claim (Docket Entry # 30, p. 7), the argument lacks merit. The contract claim constitutes a "claim by virtue of this policy" within the meaning of the limitations language in section 99. Mass. Gen. Laws ch. 175, § 99. The policy includes this language and the statute's two-year limitations period therefore applies.

N.E.3d 759, 761 (Mass. App. Ct. 2015) (affirming summary judgment pursuant to section 99 for insurance claim seeking recovery for water damage resulting from bursting pipes); Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp. 2d 37, 40 (D. Mass. 2000) (affirming summary judgment pursuant to section 99 for insurance claim seeking recovery for rain-induced flooding damage); Nunheimer v. Continental Ins. Co., 68 F. Supp. 2d at 78-80 (affirming summary judgment pursuant to section 99 for insurance claim seeking recovery for contaminants released from underground storage tanks); see also J. & T. Enters., Inc. v. Liberty Mut. Ins. Co., 428 N.E.2d 131, 133 (Mass. 1981) (construing fire insurance policy's section 99 provision broadly such that "any claim by virtue of the policy" must be subject to its limitations provisions).  These cases not only show a willingness to extend section 99 to non-fire losses, but also suggest that Massachusetts courts already apply section 99 to flooding damage and other property losses that closely resemble the facts of the present case.  See Nurse v. Omega U.S. Ins., Inc., 38 N.E.3d at 761; Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp. 2d at 40.  Plaintiff's assertion that section 99 does not govern non-fire losses is therefore unconvincing and inconsistent with the established precedent. Certification is not appropriate.

Plaintiff additionally points out that section 99 does not contain "the 'supercede' language" defendant cites to support the application of section 99 to the policy. (Docket Entry # 30). Although true, it is the presence of the statutory language prohibiting suit "unless commenced within two years from the time the loss occurred" (Docket Entry # 107, p. 110) that constitutes the focal point of the analysis in the foregoing cases and that section 99 contains. The additional unambiguous contractual "'supercede' language" simply confirms the intent of the parties that "the Massachusetts Standard Fire Policy shall apply instead" of the "legal Action Against Us, Appraisal and Cancellation Provisions contained in your policy." (Docket Entry # 28-4, p. 107, ¶ 1). Tellingly, plaintiff does not cite a case to support the argument regarding the absence of the superceding language in section 99 as rendering the "time the loss occurred" language void.

Defendant also argues that the Massachusetts discovery rule does not apply to limitations periods defined by section 99. (Docket Entry # 28-1, pp. 9-11). Plaintiff disagrees.

Under the discovery rule, "a claim accrues and the statute of limitations clock commences when a plaintiff knows, or reasonably should have known, 'that she has been harmed or may have been harmed by the defendant's conduct.'" Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1028 (Mass. 2013)

(quoting Bowen v. Eli Lilly & Co., 557 N.E.2d 739, 741 (Mass.
1990)); see Albrecht v. Clifford, 767 N.E.2d 42, 49 (Mass. 2002)
(rule tolls "limitations period until a prospective plaintiff
learns or should have learned that he has been injured").   In
tracing the history of the rule from its original application to
a legal malpractice claim and its extensions to fraudulent
misrepresentation and medical malpractice claims, the
Massachusetts Court of Appeals in Nurse astutely points out
that:

> In each instance, the court was construing statutes that
> set forth limitations periods that began when a cause of
> action "accrued."  As the court noted in Bowen, it
> developed "a discovery rule for the purpose of determining
> when a cause of action accrues."

Nurse v. Omega U.S. Ins., Inc., 38 N.E.3d 759, 762 (Mass. App.
Ct. 2015) (quoting Bowen, 557 N.E.2d at 739).  Notably, the
court in Nurse explains that because the plain language of
section 99 uses the "unambiguous" phrase "'loss occurred,'" the
"plain language" of section 99 did "not support the application
of the discovery rule."  Id. at 763-764.  The Nurse decision
addresses a breach of contract and declaratory judgment action
under a dwelling insurance policy for water damage caused by
burst pipes in a largely vacant building.[16]   Id. at 760.

---

[16]  Ongoing construction was taking place in a third floor unit
in the building.  Id. at 760.

Here too, as reasoned in Nurse, the plain and unambiguous language of section 99 that "No suit . . . for the recovery of any claim . . . *shall* be sustained . . . unless commenced within two years from the time the *loss occurred*" leaves no room for a delay of the *accrual* of the two-year limitations period under the discovery rule.  See id. at 763-764 (emphasis added).  In the "instances where the discovery rule has been extended, the governing statute of limitations required a determination of when the cause of action accrued, as opposed to when the 'loss occurred.'"  Id. at 763.  Thus, whereas both the contract, tort, and malpractice statutes of limitations use the term "accrues," section 99 employs the phrase "loss occurred" as the trigger for the limitations period.  See Mass. Gen. Laws ch. 260, §§ 2, 2A, 4; see also Nurse v. Omega U.S. Ins., Inc., 38 N.E.3d at 763-64 n.15 (noting the accrual language in Mass. Gen. Laws ch. 260, §§ 2, 4).  In the context of a denial of an insurance claim alleging a breach of contract, the term "loss" in section 99 "is the incident 'causing the damage to the property' rather than the denial of insurance benefits.'"  Nurse v. Omega U.S. Ins., Inc., 38 N.E.3d at 762 (discussing conclusion by the court in Nunheimer v. Continental Ins. Co., 68 F. Supp. 2d 75, 78 (D. Mass. 1999)); see Nunheimer v. Continental Ins. Co., 68 F. Supp. 2d at 78; Gray Excavation, Inc. v. Acadia Ins. Co., No. 0602026C, 2008 WL 496645, at *1, *3 (Mass. Super. Jan. 29, 2008)

("loss" occurred during acid contamination, not when plaintiff discovered damage nearly three years later).  Applying the foregoing reasoning in <u>Nurse v. Omega U.S. Ins., Inc.</u>, 38 N.E.3d at 762, including the court's adherence to the statutory language and the unambiguous "'loss occurred'" phrase, the discovery rule does not delay the running of the two-year limitations period in section 99 and the policy.  The damage to the property took place in February 2011 and the two-year time period expired in February 2013.[17]  Accordingly, this case filed in December 2016 is untimely.

Defendant next contends that it did not engage in any activity that would waive the application of the statute of limitations.  (Docket Entry # 28-1).  Plaintiff summarily states that defendant waived its statute of limitations defense. (Docket Entry # 30, p. 12).  Plaintiff does not, however, advance any additional argument beyond this conclusion.  (Docket Entry # 30, p. 12).

---

[17]  Furthermore, the loss or damages from the water intrusions took place on February 4, 2011 as opposed to gradually over an extended period of time.  <u>Cf. Mulhern v. Philadelphia Indem. Ins. Co.</u>, 802 F. Supp. 2d 317, 321 (D. Mass. 2011).  To the extent <u>Mulhern</u> applies the discovery rule to an insurance claim arising out of "gradual accumulation of damage" over the course of three and a half months, the decision does not apply to the factual circumstances in the case at bar.  <u>See Nurse v. Omega U.S. Ins., Inc.</u>, 38 N.E.3d at 762 n.13 (discussing <u>Mulhern</u> 802 F. Supp. 2d at 802).

It is well established in Massachusetts that "[a]n insurer does not waive its right to raise a statute of limitations defense merely by making payment for undisputed losses while specifically reserving its rights as to all disputed losses." Ora Catering Inc. v. Northland Ins. Co., 57 F. Supp. 3d 102, 108 (D. Mass. 2014). If courts considered every payment for an undisputed loss as a waiver of rights to assert future rights and defenses, insurance companies would have little incentive to promptly distribute coverage payments. See id. Waiver therefore occurs only when the insurer voluntarily or intentionally relinquishes a known right. Merrimack Mut. Fire Ins. Co. v. Nonaka, 606 N.E.2d 904, 906 (Mass. 1993).

In communications between the two parties, defendant repeatedly reserved its rights or reasserted its rights or defenses under the policy to challenge coverage. (Docket Entry # 28-9) (Docket Entry # 28-10, p. 4) (Docket Entry # 28-15, p. 3) (Docket Entry # 34-2, p. 3); see Merrimack Mut. Fire Ins. Co. v. Nonaka, 606 N.E.2d at 906. The April 2013 reservation of rights letter states that defendant retains a "full reservation of rights" and that "[n]one of our activities to date are to be construed . . . as a waiver of any of the rights or defenses available under the terms and conditions of the policy, all of which are hereby reserved." (Docket Entry # 28-9). The August 2013 denial letter repeats defendant's expressed intention to

reserve its defenses. (Docket Entry # 28-10, p. 4). When defendant sent an additional demand for examination under oath and request for certain documents in July 2014, defendant once again reiterated and included its right to assert a statute of limitations defense. (Docket Entry # 28-15). The September 5, 2014 email to plaintiff's counsel reasserts defendant's continued reliance on the statute of limitations. (Docket Entry # 34-2, p. 3). Accordingly, in light of the above evidence and the absence of contrary evidence that gives rise to a genuinely disputed fact regarding defendant's voluntary or intentional waiver, plaintiff's waiver argument does not forestall summary judgment. See Ora Catering Inc. v. Northland Ins. Co., 57 F. Supp. 3d at 108; Merrimack Mut. Fire Ins. Co. v. Nonaka, 606 N.E.2d at 906.

Finally, defendant argues it is not estopped from asserting the statute of limitations defense. (Docket Entry # 28-1). Plaintiff disagrees and contends that "genuine factual issues remain" regarding the reasonableness of plaintiff's reliance on defendant's conduct throughout the coverage dispute. (Docket Entry # 30, p. 13). Plaintiff posits that it reasonably relied on defendant's "assurances of good faith in the submission and investigative process." (Docket Entry # 30, p. 14). Plaintiff also points out that it "reasonably pressed its claim . . . only

30

after [defendant] expressed its willingness to consider the claim." (Docket Entry # 30).

The parties agree on the elements of an estoppel claim. (Docket Entry # 28-1, pp. 11-12) (Docket Entry # 30, p. 13). Succinctly stated, to prevail on an estoppel claim in Massachusetts, a plaintiff must show: "(1) a representation intended to induce a course of conduct on the part of the person to whom the representation was made; (2) reasonable reliance upon the representations by that party; and (3) detriment to that party as a result of the reliance." Consolo v. Bank of Am., Civil Action No. 15-11840-DJC, 2017 WL 1739171, at *1, *4 (D. Mass. May 2, 2017); Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp. 2d at 40 (citing Turnpike Motors Inc. v. Newbury Group, Inc., 596 N.E.2d 989, 991 (Mass. 1992)). As also pointed out by defendant, plaintiff's reliance must be reasonable. See Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp. 2d at 40.

A number of courts adjudicating estoppel claims against a statute of limitations defense examine whether the defendant's communication was "a representation calculated to induce the Plaintiffs to forego suit during the two-year statute of limitations period." Id.; see also Kozikowski v. Toll Bros., Inc., 354 F.3d 16, 24 (1st Cir. 2003) (affirming summary judgment for estoppel claim in the absence of clear assurances

that signified defendants' intentions to carry out plans); Coady v. Martin Lumber and Cedar Co., 167 F. Supp. 2d 166, 171 (D. Mass. 2001) (successful estoppel claims must prove "that the defendant lulled the plaintiff" into delaying suit past the limitations period). As aptly argued by defendant, its conduct of investigating the matter subject to an express reservation of rights could not have induced plaintiff to forego filing suit. (Docket Entry # 28-1) (discussing Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp. 2d at 39-40, at length). The April 4, 2013 letter expressly reserved its rights and defenses under the policy. (Docket Entry # 28-9). Two days prior to the letter, Kearney emailed Nemet and *Barrett* that "the two year statute of limitations expired on this claim that occurred in [sic] February 4, 2011." (Docket Entry # 28-8). The August 8, 2013 letter stated that "no act" by defendant's attorneys "shall constitute a waiver or *estoppel* of any defense, term, provision, or condition under [the] policy." (Docket Entry # 28-10) (emphasis added). This denial letter quoted various provisions of the policy including the limitations provision that "no one may bring legal action against the insurance company unless . . . '[t]he action is brought within two years after the date on which the direct physical loss or damage occurred.'" (Docket Entry # 28-10, p. 4). The July 2014 letter that defendant sent requesting documents and examinations

under oath once again included a reservation of rights. (Docket

Entry # 28-15, p. 3). This letter specifically informed

plaintiff that "[a]ny and all investigations taken by" defendant

"*shall not constitute* a waiver of, or *an estoppel to assert*, any

of the terms or conditions of the policy of insurance described

above or any rights or defenses Strathmore Insurance Company may

have which may arise under applicable law, *including* . . .

*limitations of action* . . .." (Docket Entry # 28-15, p. 3)

(emphasis added). Defendant's conduct as a whole[18] does not

amount to a representation intended to induce plaintiff's

reliance or import reasonable reliance on the part of plaintiff.

See, e.g., Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123

F. Supp. 2d at 40 (finding that letter from insurer stating it

had not yet decided to cover plaintiff's loss could not support

equitable estoppel claim); cf. John Beaudette, Inc. v. Sentry

Ins. A Mutual Co., 94 F. Supp. 2d 77, 130 (D. Mass. 1999)

(denying summary judgment because insurer affirmatively

represented and unequivocally stated that coverage existed

without mentioning any reservation of rights).

To support its contention that estoppel usually requires

close factual scrutiny, plaintiff relies in part on John

Beaudette, Inc., a case that underscores the fact-specific

---

[18]  See footnote 26 and related text.

nature of estoppel claims.  John Beaudette, Inc. v. Sentry Ins.,
94 F. Supp. 2d at 130.  Unlike the insurer in John Beaudette,
Inc., however, defendant never affirmatively represented that
coverage would apply to the exterior damage.  See id. (by
letter, "Gross wrote to JBI's attorney and unequivocally
informed him 'that there would be coverage for both on-site and
off-site damage and cleanup costs'" without "mention of a
reservation of rights").  To the contrary, defendant repeatedly
reserved its right to assert all rights and defenses.  The
payments defendant made to cover the interior losses do not by
themselves support a finding of estoppel.  The decision to
reconsider coverage was subject to a reservation of rights and,
as such, did not constitute an affirmative intention to support
coverage.  See American Guarantee & Liab. Ins. Co. v. Lamond,
Civil Action No. 13-13168-RGS, 2016 WL 1312008, at *3 (D. Mass.
Apr. 4, 2016) (denying estoppel defense on summary judgment and
rejecting argument that insurance company's failure to send
second reservation of rights letter gave rise to an estoppel);
Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp.
2d at 40; Gallant v. Fed. Mut. Ins. Co., 235 N.E.2d 810, 813
(Mass. 1968).  While this court recognizes the fact-intensive
nature of estoppel claims, no reasonable finder of fact could
conclude that defendant had an intention to induce plaintiff
into forgoing the limitations provision or that plaintiff's

reliance was reasonable.  See Riverdale Mills Corp. v. Fireman's Fund Ins. Co., 123 F. Supp. 2d at 40; John Beaudette, Inc. v. Sentry Ins., 94 F. Supp. 2d at 130.

Where, as here, "there is no dispute as to essential evidentiary facts controlling the application of the statute of limitations," summary judgment "is appropriate."  Nunheimer v. Continental Ins. Co., 68 F. Supp. 2d at 77.  The breach of contract claim is therefore time barred pursuant to section 99's two-year statute of limitations provision included in the policy.  See id.  Summary judgment on Count I is appropriate.

B.  Declaratory Judgment

Based on the same arguments, defendant moves for summary judgment on the declaratory judgment count.  (Docket Entry # 28).  In the declaratory judgment count, "[p]laintiff requests that the Court declare that all amounts expended to repair damage to the Complex are covered by the Policy and Plaintiff is also entitled to interest and costs on said amount."  (Docket Entry # 1, p. 4).

"'(T)he operation of the Declaratory Judgment Act is procedural only.'"  Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (internal citation omitted).  "Because a declaratory judgment action is a procedural device used to vindicate substantive rights, it is barred only if relief on a direct claim based on such rights would also be barred."  Stone

35

v. Williams, 970 F.2d 1043, 1048 (2nd Cir. 1992); Int'l Ass'n of Machinists and Aerospace Workers v. Tennessee Valley Auth., 108 F.3d 658, 668 (6th Cir. 1997) (quoting Stone v. Williams, 970 F.2d at 1048); see also Stefanick v. Planning Board of Uxbridge, 657 N.E.2d 475, 478 (Mass. App. Ct. 1995) ("permissible expedient of a complaint for declaratory judgment . . . does not suspend" application of statute of limitations). "A contrary rule would allow a plaintiff to 'make[e] a mockery of the statute of limitations by the simple expedient of creative labeling.'" Int'l Ass'n of Machinists & Aerospace Works v. Tennessee Valley Auth., 108 F.3d at 668 (quoting Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991)).

Here, there is no reason to find the declaratory judgment claim timely and not subject to the two-year statute of limitations in section 99 when the accompanying breach of contract claim is untimely as subject to the two-year statute of limitations in section 99. See Page v. LeRoux, 685 N.E.2d 1205, 1207 n.2 (Mass. App. Ct. 1997) (complaint seeking declaratory relief as to ownership of property interest under partnership agreement subject to six-year limitations period applicable to breach of contract claims); see also Gilbert v. City of Cambridge, 932 F.2d at 58 (if "'a claim for declaratory relief could have been resolved through another form of action which

has a specific limitations period, the specific period of time will govern'") (internal citations omitted).

## II.  Defendant's Motion to Strike

Separately, defendant moves to strike Amoruso's expert report, affidavit, and testimony at trial.[19]  (Docket Entry # 26) (Docket Entry # 34, p. 2).  Defendant seeks to strike Amoruso's opinions because they:  (1) constitute legal conclusions regarding questions of law; and (2) will not assist a trier of fact in understanding the evidence or determining a disputed material fact.  (Docket Entry # 26).

### DISCUSSION

## A.  Expert Report

With respect to the expert report, plaintiff contends that because defendant filed the motion to strike the report before moving for summary judgment, it is premature.  (Docket Entry # 27).  Plaintiff submits that it should have an opportunity to review a summary judgment motion first before evaluating the

---

[19]  In a reply brief, defendant seeks to strike Amoruso's affidavit because it reiterates the same opinions found in the expert report.  (Docket Entry # 34, p. 2).  Plaintiff did not object to the inclusion of the affidavit in the motion to strike by seeking leave to file a sur-reply, and the opinions in the affidavit overlap, to a degree, the opinions in the affidavit. In this court's discretion, the motion to strike therefore applies to Amoruso's expert report, his affidavit, and his testimony as trial.

evidence it should present in opposition to such a motion.
(Docket Entry # 27).

Defendant filed the motion to strike more than two weeks
before filing the motion for summary judgment. Notably, neither
plaintiff's memorandum in opposition to summary judgment nor its
LR. 56.1 statement of material facts cite to Amoruso's expert
report. (Docket Entry # 31). Instead, plaintiff relies on the
affidavit by Amoruso that plaintiff subsequently submitted.
(Docket Entry # 30-1). The motion to strike the expert report
filed on October 16, 2017 is moot to the extent defendant seeks
"to preclude" its use to oppose defendant's summary judgment
motion. (Docket Entry # 26). Although the motion to strike
also seeks to preclude Amoruso from testifying at trial (Docket
Entry # 26), the allowance of the summary judgment motion moots
this request.

B. Affidavit

Next, this court addresses defendant's request to strike
Amoruso's affidavit, which plaintiff filed as part of the
summary judgment record on November 21, 2017. (Docket Entry #
30-1) (Docket Entry # 34, p. 2). In response to defendant's
aforementioned arguments, plaintiff submits that: (1) Amoruso's
"'knowledge, skill, experience, training, or education'" in the
insurance industry will assist a trier of fact to understand and
apply the policy; (2) Amoruso can testify about industry

practice, including how a particular insurance policy is
structured and how ambiguous terms are typically understood in
other insurance policies; and (3) excluding Amoruso's expert
opinion is a drastic remedy that is avoidable by limiting his
testimony to certain customs and usages in the insurance
industry.  (Docket Entry # 27).

Federal Rule of Evidence 702 ("Rule 702") governs the
admissibility of expert testimony, which, in pertinent part,
states:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if
> (1) the testimony is based upon sufficient facts or data, (2)
> the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and
> methods reliably to the facts of the case.

Fed. R. Evid. 702.  In order to meet the aims of Rule 702, the
court acts as a gatekeeper by ensuring that the expert opinion
"'both rests on a reliable foundation and is relevant to the
task at hand.'"  Milward v. Rust-Oleum Corp., 820 F.3d 469, 473
(1st Cir. 2016) (affirming district court's exclusion of expert
testimony under Rule 702 and allowance of summary judgment)
(citation omitted); see Daubert v. Merrell Dow Pharm., Inc., 509
U.S. 579, 591 (1993) (Rule 702's requirement that expert
testimony "'assist the trier of fact'" is concerned primarily

with relevance); Pages-Ramirez v. Ramirez-Gonzalez, 605 F.3d 109, 115 (1st Cir. 2010).

"'It is black-letter law that it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.'" Bacchi v. Mass. Mut. Life Ins. Co., 2016 WL 1170958, *1, *2 (D. Mass. March 23, 2016) (quoting Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997)). Accordingly, expert testimony that discusses "purely legal issues is rarely admissible." Nieves-Villanueva v. Soto-Rivera, 133 F.3d at 99; see Bacchi v. Mass. Mut. Life Ins. Co., 2016 WL 1170958, at *4 (striking expert report devoted to discussing legislative history of Massachusetts statute); OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada, 804 F. Supp. 2d 77, 83 (D. Mass. 2011) (striking expert affidavit seeking to interpret insurance policy's renewal period because it amounted to legal opinion); Ji v. Bose Corp., 538 F. Supp. 2d 354, 360 (D. Mass. 2008) (striking commentary on background legal principles, bald legal conclusions, and opinions regarding legal force of each party's actions); Carrier v. Am. Bankers Life Assur. Co. of Fla., Civil Action No. 05-430-JD, 2007 WL 3124653, at *2 (D.N.H. Oct. 25, 2007) (excluding expert's opinion explaining "legal requirements of state law for credit insurance policies" as "merely parrot[ing] the law, which is the province of the court"). "An expert cannot simply opine as to

his or her view of a disputed point of law." Adams v. New England Scaffolding, Inc., Civil Action No. 13-12629-FDS, 2015 WL 9412518, at *6 (D. Mass. Dec. 11, 2015); see also RTR Techs., Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013) ("'expert opinion must be more than a conclusory assertion about ultimate legal issues'" in order to thwart a motion for summary judgment") (citation omitted).

Although "there is no blanket prohibition on expert testimony concerning the law," Adams v. New England Scaffolding, Inc., Civil Action No. 13-12629-FDS, 2015 WL 9412518, at *5 (D. Mass. Dec. 22, 2015), a "district court has broad discretion to exclude expert opinion evidence about the law that would impinge on the roles of the judge and the jury." Pelletier v. Main St. Textiles, LP, 470 F.3d 48, 54 (1st Cir. 2006). Simply stated, expert testimony should "help the trier of fact" in comprehending "a fact in issue" or the factual evidence. Fed. R. Evid. 702; see United States v. Pena-Santo, 809 F.3d 686, 694 (1st Cir. 2015) ("'[f]or expert testimony to be admissible under Fed. R. Evid. 702, it must "be relevant to the task at hand" and helpful to the jury in its deliberations'"). Because the jury does not decide "pure questions of law, such testimony is not helpful to the jury and so does not fall within the literal terms of Fed. R. Evid. 702." Nieves-Villanueva v. Soto-Rivera, 133 F.3d at 100. For example, an expert's opinion interpreting

exclusionary provisions, including whether an exclusion

endorsement superseded an exclusion, invades the court's

province to interpret the language of the policy.  Maine State

Properties, LLC v. Chubb Custom Ins. Co., No. 2:15-cv-140-JHR,

2016 WL 8672924, at *14 (D. Me. July 8, 2016).  Accordingly, the

court struck the opinion as "irrelevant and unhelpful to the

trier of fact."  Id.

Although "an expert may not offer an opinion concerning a

legal question," he may testify about industry standards.  Levin

v. Dalva Bros., Inc., 459 F.3d 68, 79 (1st Cir. 2006).  Hence,

"in general, the customs and practices of an industry are proper

subjects for expert testimony."  Pelletier v. Main Street

Textiles, LP, 470 F.3d at 55; accord Massachusetts Mut. Life

Ins. Co. v. DB Structured Prod., Inc., Civil Action No. 11-

30039-MGM, 2015 WL 2130060, at *13 (D. Mass. May 7, 2015)

("experts may opine as to industry customs and practices, if

sufficiently qualified").  "The line between testimony regarding

what the law requires and testimony describing how an industry

practice typically operates is not always clear."  Ji v. Bose

Corp., 538 F. Supp. 2d at 358.  Testimony from an expert that

describes industry practices may incorporate the expert's

"understanding of the law," but "the expert cannot testify as to

what the law requires."  Bacchi v. Mass. Mut. Life Ins. Co.,

2016 WL 1170958, at *3 (allowing expert testimony about specific

characteristics of industry practice and striking portions of
opinion containing legal analysis); see also Nieves-Villanueva
v. Soto-Rivera, 133 F.3d at 101 (considering situations where
testimony on "rare, highly complex and technical matters" that
incorporates limited legal discussion could be admissible);
Adams v. New England Scaffolding, Inc., Civil Action No. 13-
12629-FDS, 2015 WL 9412518, at *5-7.

With more than 45 years of experience in the insurance
industry, Amoruso undeniably possesses the knowledge and ability
to deliver competent testimony on common insurance practices.
(Docket Entry # 30-1).  Turning to the content of the opinions,
the ninth paragraph of Amoruso's affidavit opines "that the
contractual two-year limit for filing this action . . . does not
apply" because it appears in the standard fire policy
endorsement and the "loss was not a fire-related loss."  (Docket
Entry # 30-1, ¶ 9).  As discussed above, case law and
Massachusetts statutes establish the contrary.  The opinion is
not helpful to the trier of fact regarding a factual issue.
Rather, in this instance it encroaches on the role of this court
to determine the law.

For similar reasons, the same result applies to paragraph
ten.  In evaluating the insurance policy's use of the
Massachusetts standard fire policy provisions, Amoruso states
the following:

> I agree that for claims handling and coverage purposes the
> commercial property provisions of the Policy apply here,
> and I do not believe that Mr. Baroncini or Strathmore
> should have considered anything contained within the fire
> coverage provisions of the Policy.  It is my professional
> opinion that proper handling of this claim by Strathmore
> would not have referenced or relied upon the Massachusetts
> Standard Fire Policy Provisions because this case does not
> involve a fire loss.

(Docket Entry # 30-1, ¶ 10).  In this paragraph, Amoruso states

that defendant should not rely on the Massachusetts standard

fire policy because the loss did not involve a fire loss.  He is

opining that the standard policy provisions in the statute and

in the policy do not apply because this case does not involve a

fire loss.  Under the case law, as recited previously, courts

apply the statutory language to non-fire losses.  Thus, like the

distinction drawn in <u>Pelletier</u> between an expert testifying

about what the law means and an expert testifying about the law

as a factual issue, for example, whether defendant's reliance on

tax law was wilful and intentional, Amoruso's testimony falls

into the former category.  See <u>Pelletier v. Main Street</u>

<u>Textiles, LP</u>, 470 F.3d at 55 (citing <u>United States v. Garber</u>,

607 F.2d 92, 96-98 (1st Cir. 2003)).[20]  Amoruso is presenting an

---

[20]  The court in <u>Garber</u> framed the intersection between the facts
and the law as follows:

> The government must demonstrate that the defendant
> willfully concealed and omitted from her return income
> which she knew was taxable.  When the taxability of
> unreported income is problematical as a matter of law, the
> unresolved nature of the law is relevant to show that

alternative opinion to this court's determination of the law and the determination of the Massachusetts cases cited previously regarding the application of the statutory language in section 99 to non-fire losses. The statutory terms in the policy pertaining to the commencement of suit "within two years from the time the loss occurred" are plain and unambiguous, and case law establishes their application to non-fire losses. Here again, the opinion usurps the role of this court as the arbiter of the law and impinges on the role of this court in determining what the law means in the context of a non-fire loss. See id. at 54. In this court's discretion, the opinion in paragraph ten is stricken from the summary judgment record. See Maine State Properties, LLC v. Chubb Custom Ins. Co., 2016 WL 8672924, at *14; S.E.C. v. Goldsworthy, 2008 WL 2943398, at *4 (stating it is inappropriate "to have experts opine 'as to the legal obligations of the parties under the contract'" and "is particularly inappropriate in this case, where the contract does not require 'scientific, technical, or other specialized knowledge' to interpret its terms").

---

defendant may not have been aware of a tax liability or may have simply made an error in judgment.

United States v. Garber, 607 F.2d at 98 (finding the expert testimony appropriate). Here, the law is not unresolved and Amoruso's testimony does not concern the interpretation of the law as a factual issue in this case. See Pelletier v. Main Street Textiles, LP, 470 F.3d at 55.

In paragraph 11, Amoruso discusses the policy's reliance on section 99's limitations language. (Docket Entry # 30-1, ¶ 11). Citing the belief of Baroncini, defendant's vice president of property claims, that Massachusetts law requires the "'supersede' language," the affidavit states:

> It is my professional opinion that Mr. Baroncini is mistaken. The "supersede" language quoted above does not appear in the relevant statute, Mass. G.L.c. 175, § 99, and it is my professional opinion that for claims handling and coverage purposes, the Massachusetts Standard Fire Policy does not apply, and should not be applied, to non-fire losses such as those in this case. Based upon my experience, understanding and knowledge of claims practices by insurers in Massachusetts, they would not apply the Massachusetts Fire Policy conditions to a non-fire loss.

(Docket Entry # 30-1, ¶ 11). For reasons stated with respect to paragraph ten, including the distinction drawn in Pelletier, 470 F.3d at 55, the opinion in paragraph 11 intrudes upon this court's role in deciding and determining the law. The contractual superceding language that certain provisions are "void" and that the provisions of the standard fire policy "shall apply instead" is clear and unambiguous contractual language in the policy, as determined by this court. It requires no expert testimony, which both impinges on this court's role and is not helpful to the trier of fact. It is therefore stricken from the summary judgment record. See Maine State Properties, LLC v. Chubb Custom Ins. Co., 2016 WL 8672924, at *8, *14 (interpreting whether exclusion endorsement

superseded an exclusion invades court's province to interpret policy language of the policy); S.E.C. v. Goldsworthy, 2008 WL 2943398, at *4; see also Pelletier v. Main Street Textiles, LP, 470 F.3d at 54-56.

Next, in paragraph 13 Amoruso discusses the policy's limitations period in the context of the Tolling Agreement and when plaintiff "discovered" the "concealed damage." (Docket Entry # 30-1, ¶ 13). In pertinent part, paragraph 13 states:

> I believe that under standard claims handling practices by insurers in Massachusetts, this action would be treated as timely since under the parties' Tolling Agreement . . . this action would be treated as commenced less than two (2) years after the concealed damage that is the subject of this action was discovered.

(Docket Entry # 30-1, ¶ 13). Thus, in examining the appropriate "claims handling practices" of the limitations provision in the industry, Amoruso arrives at the legal conclusion that the action would properly toll in two years after the exterior damage "was discovered." (Docket Entry # 30-1, ¶ 13).

First, including the opinion in paragraph 13 in the summary judgment record does not alter the outcome of the summary judgment motion. As explained previously, the statute of limitations in section 99 included in the policy expired prior to the effective date of the Tolling Agreement. Second, Amoruso's description of the "standard claims handling practices" that "would treat" the loss as commenced is incorrect

because a number of Massachusetts cases do not apply the two-year limitations period in section 99 contained in an insurance policy as commencing when the damage "was discovered" (Docket Entry # 30-1, ¶ 13).  See Nunheimer v. Continental Ins. Co., 68 F. Supp. 2d at 78; Goldsmith v. Reliance Ins. Co., 228 N.E.2d at 706; see also Pelletier v. Main Street Textiles, LP, 470 F.3d at 54-55; Adams v. New England Scaffolding, Inc., 2015 WL 9412518, at *6; Nieves-Villanueva v. Soto-Rivera, 133 F.3d at 101.  It is therefore stricken as an impermissible legal conclusion as well as unhelpful to the trier of fact.

Finally, in paragraph 14 Amoruso opines about the issues of waiver and estoppel.  (Docket Entry # 30-1, ¶ 14).  In pertinent part, paragraph 14 states:

> Based upon my professional experience, there are times when an insurance company must pay a claim because it is estopped to deny coverage, or has waived a contractual or other defense to payment.  Based upon the contents of the Langweber and Quinby Affidavits filed herewith, it is my professional opinion that Strathmore is estopped to deny coverage, or has waived a contractual or other defense to payment.  Based upon my experience, understanding and knowledge of claims practices by insurers in Massachusetts, they would not apply the Massachusetts Fire Policy conditions to a non-fire loss.  Based on my more than 30 years of experience, an insurer in Massachusetts would have made a payment in the claim at issue in this case.

(Docket Entry # 30-1, ¶ 14).  A trier of fact, however, is fully capable of drawing his or her own conclusion from the record regarding the existence of an estoppel or waiver.  As explained by the court in Baumann, "'it would not assist the trier of fact

for the expert to offer'" an opinion that an insurer "'is barred by estoppel from denying coverage'" because "'a jury is fully qualified to make on its own determination from the evidence presented,'" and "'such testimony would not assist the trier of fact.'" Baumann v. Am. Family Mut. Ins. Co., 836 F. Supp. 2d 1196, 1202 (D. Colo. 2011) (quoting Lone Star Steakhouse and Saloon, Inc. v. Liberty Mutual Ins. Group, 343 F. Supp. 2d 989, 1015 (D. Kan. 2004)). Here too, the opinions in paragraph 14 contain factual conclusions about claims practices of Massachusetts insurers that would not assist a trier of fact. Exercising this court's discretion, the opinions in paragraph 14 are stricken from the summary judgment.

In the alternative, even if this court considered the opinions in paragraph 14, they do not create a genuinely disputed issue of material fact and do not alter the decision to allow summary judgment. In the context of the repeated assertions and statements that defendant was reserving its rights and defenses and that no act shall constitute an estoppel or waiver, Amoruso's opinions in paragraph 14 do not create a genuinely disputed material fact vis-à-vis either estoppel or waiver.

As a final mater, plaintiff argues that Amoroso's opinion should be admitted into evidence because it will assist this court and finders of fact to understand the "technical,

specialized terminology" embedded within a 166-page insurance policy. (Docket Entry # 27, p. 8). According to plaintiff, Amoruso's testimony will provide helpful guidance to assist the trier of fact to "navigat[e] through a complicated and sophisticated insurance agreement." (Docket Entry # 27, p. 8). This dispute, however, is not concerned with the bulk of the language in the policy. Rather, it primarily involves the contractual superceding language and the statutory language that commences the limitations period at "the time the loss occurred." (Docket Entry # 28-4, pp. 107, 110). Moreover, the contested areas of Amoruso's opinions are narrowly confined to a discrete set of issues, namely, the policy's inclusion of section 99 limitations language, the effect of the Tolling Agreement, and whether defendant waived or estopped itself from asserting the two-year statute of limitations in the policy. (Docket Entry # 30-1, ¶¶ 10-11, 13-14). Furthermore, except for the factual conclusions regarding estoppel and waiver which the trier of fact is fully capable of determining without the potentially confusing and perceived significant of an expert's opinions, the central issues in the summary judgment motion are legal issues involving construction of unambiguous statutory and contractual terms in the policy, see Nurse v. Omega U.S. Ins., Inc., 38 N.E.3d at 763-64, application of Massachusetts case law, and statutory construction. Amoruso's opinions will not,

as discussed above, assist the trier of fact, and they impinge on the role of this court.

III.  Motion for Leave to Amend Complaint

Plaintiff filed the motion for leave to amend the complaint on January 2, 2018.  (Docket Entry # 36).  Plaintiff therefore seeks to amend the complaint after defendant moved for summary judgment on October 31, 2017.  (Docket Entry # 28).  As previously noted, the amended complaint seeks to include two additional counts for violation of chapters 93A and 176D. (Docket Entry # 36-1).  Defendant opposes the motion because: (1) the 93A and 176D claims are untimely; (2) chapter 176D does not provide a private cause of action; (3) undue and prejudicial delay; and (4) futility.  (Docket Entry # 38).  Plaintiff did not seek leave to file a reply brief or otherwise specifically address the futility of the chapter 93A and chapter 176D claims or the absence of a private cause of action under chapter 176D. See Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to but not properly developed before a magistrate judge are deemed waived").[21] Separately, although plaintiff does not expressly refer to section 11 in the proposed amended complaint or in the motion to amend, the proposed chapter 93A claim raises a section 11 claim

---

[21]  This court addresses the merits to complete the record.

because it alleges that "Plaintiff *and* Defendant have been engaged in trade or commerce" in Massachusetts "within the meaning of chapter 93A" and "caused Plaintiff to suffer a loss of money."[22] (Docket Entry # 36-1, ¶¶ 44-45) (emphasis added); see Mass. Gen. Laws ch. 93A, § 11.

Turning to the allegations of the chapter 93A claim, they incorporate all of the previous allegations regarding the chapter 176D claim and purported chapter 176D violation in the proposed amended complaint. (Docket Entry # 36-1, ¶ 43). The proposed amended complaint alleges that "notwithstanding the passage of time," defendant failed to pay the "claim once liability and damages" became "clearly established." (Docket Entry # 36-1, ¶ 46). Defendant also allegedly misrepresented its position as well as the "true deadline" to make a claim for the "Concealed Damage." (Docket Entry # 36-1, ¶¶ 40, 43). Based on defendant's assurances "that the parties would work toward" an "amicable resolution," plaintiff "delayed filing suit," according to the proposed amended complaint. (Docket Entry # 36-1, ¶¶ 36, 43). It further alleges that "Plaintiff

---

[22] Violations of chapter 176D constitute "probative evidence" as opposed to "per se proof, of egregious business misconduct" in a section 11 claim. Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802 F.3d 39, 54 (1st Cir. 2015). In contrast, a consumer asserting a section nine claim "may recover for violations of G.L. c. 176D, § 3, cl. 9, without regard to whether the violation was unlawful under G.L. c. 93A, § 2." Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 917 (Mass. 1993).

and its counsel were never advised or led to believe that Defendant would refuse" to pay the claim. (Docket Entry # 36-1, ¶¶ 34, 43). Defendant purportedly "misrepresented the true purpose for its 'investigation[,]' which was to search for additional reasons to deny the claim[,]" and it engaged in "unfair settlement practices." (Docket Entry # 36-1, ¶¶ 40, 42, 43). Finally, defendant "knowingly induced [p]laintiff to believe that [d]efendant intended to adjust and make payment on its claim for Concealed Damage caused by the Weather Events . . .." (Docket Entry # 36-1, ¶ 45). In turn, plaintiff purportedly incurred significant costs and expenses as it "jump[ed] through the hoops" that defendant set out during the investigation. (Docket Entry # 36-1, ¶ 48).

STANDARD OF REVIEW: FUTILITY

It is well settled that futility constitutes an adequate basis to deny amendment. See generally Maine State Bldg. and Constr. Trades Council, AFL-CIO v. United States Dep't of Labor, 359 F.3d 14, 19 (1st Cir. 2004). The proper standard to gauge futility depends on the posture of the action. See Hatch v. Dep't for Children, Youth, and Their Families, 274 F.3d 12, 19 (1st Cir. 2001). Where, as here, a plaintiff seeks leave to amend after the filing of a summary judgment motion, "'the proposed amendment must be not only theoretically viable but also solidly grounded in the record.'" Somascan, Inc. v.

_Philips Med. Sys. Nederland, B.V._, 714 F.3d 62, 64 (1st Cir.
2013) (quoting _Hatch v. Dep't for Children, Youth, and Their_
_Families_, 274 F.3d at 19).  In such circumstances, "'an
amendment is properly classified as futile unless the
allegations of the proposed amended complaint are supported by
substantial evidence.'"  _Id._ (quoting _Hatch v. Dep't for_
_Children, Youth, and Their Families_, 274 F.3d at 19).

FACTUAL BACKGROUND

Having already summarized the evidence in the record, this
court only briefly recounts pertinent facts.  At the end of
January 2013, Grosser, Rodman's vice president, sent the email
to Barrett "confirming" Barrett's inquiry "about the merits of
filing a supplemental claim related to the large ice dam loss."
(Docket Entry # 28-6).  As discussed above, the two-year statute
of limitations expired shortly thereafter in early February
2013.  On April 2, 2013, Barrett sent the email to Rodman
stating that "The Board would like to investigate opening a
supplemental claim associated with the prior ice dam claim" and
asking for an adjuster to contact him.  (Docket Entry # 28-7).
The next morning, Kearney, the general adjuster, sent the email
to Nemet at Rodman, Barrett at Crowninshield, and Auli,
plaintiff's senior claims examiner, stating that "the two year
statute of limitations has expired on this claim that occurred
in February 4, 2011." (Docket Entry # 28-8).  In the email less

than two hours later, Nemet asked Kearney "to revisit that answer that you just gave me about the statute being up" and that "there is a possible supplemental claim" in light of Grosser's January 31, 2013 email, which she forwarded, confirming the inquiry about the merits on filing a supplemental claim.[23]  (Docket Entry # 30-2).

The next day, April 4, 2013, Kearney advised plaintiff and Barrett that defendant will investigate the supplemental claim "under a *full reservation of rights* due to [the] question of coverage." (Docket Entry # 28-9) (emphasis added).  Eight days later, Kearney asked Auli for the authority to obtain "the services of AEGIS Engineering to support the reopening of" the supplemental damages claim.  (Docket Entry # 30-2).  Baroncini approved the request the same day.  (Docket Entry # 30-2).[24]  In the August 8, 2013 letter, defendant denied the supplemental claim for the exterior damage stating it completed the investigation.  (Docket Entry # 28-10).  Langweber, however, states by affidavit that plaintiff denied the claim "without performing an investigation." (Docket Entry # 30-2).  In

---

[23]  In the context of the summary judgment motion as well as the proposed chapter 93A claim, this court does *not* consider the emails for the truth of the matters asserted therein.
[24]  This email chain provides a basis for the averments by Langweber and Quinby that "Strathmore advised" Rodman and plaintiff "in April 2013 that the Meadows was not precluded from making a claim for repair of the Concealed Damage." (Docket Entry ## 30-2, 30-3) (citing attached exhibit A).

December 2013, Barrett sent Auli the previously noted letter stating that the "Condominium Association does not accept the findings in the rejection letter" sent on August 8, 2013. (Docket Entry # 28-11).

In the May 30, 2014 letter to Auli, Quinby identified his law firm as plaintiff's counsel, characterized the denial as unjustified, and stated his belief that the exterior damage to the building envelope is a covered claim. (Docket Entry # 28-12). After Quinby asked defendant to reconsider the denial,[25] plaintiff "agreed to do so," according to Langweber. (Docket Entry ## 28-12, 30-2). The July 30, 2014 letter from defendant's counsel to plaintiff requests various records and an examination of a corporate representative in connection with defendant's investigation. (Docket Entry # 28-15).

Meanwhile, plaintiff hired the aforementioned experts as well as undertook and completed the repair at its own expense. (Docket Entry ## 302-, 30-3). Plaintiff spent considerable time and effort and "incurred substantial fees for professional assistance" to provide plaintiff with the information and the documents it requested. (Docket Entry ## 30-2). Langweber attests he was in active communication with Rodman about the

---

[25] The averment does not refer to Quinby by name. Rather, Langweber attests that "After counsel for Meadows requested that Strathmore reconsider its denial of the claim for Concealed Damage, Strathmore agreed to do so." (Docket Entry # 30-2).

claim for exterior damage.  (Docket Entry # 30-2).  Quinby
similarly avers he "was in frequent contact with" defendant's
counsel throughout the investigation.  (Docket Entry # 30-3).
According to Quinby, defendant's counsel "repeatedly assured"
him that plaintiff "was going to attempt to amicably resolve the
Meadow's claim" after completing the investigation,
"notwithstanding its initial denial of the claim," i.e., the
August 8, 2013 denial letter.  (Docket Entry ## 28-10, 30-3).
Quinby further attests that plaintiff "delayed filing suit in
reliance upon assurances of Strathmore's counsel that the
parties would work toward . . . an amicable resolution."[26]
(Docket Entry # 30-3).  Quinby and Langweber uniformly state
that, if plaintiff "had . . . suggested that it would be denying
the entirety of the Meadow's claim for Concealed Damage, the
Meadows would have" filed suit "immediately."  (Docket Entry ##
30-2, 30-3).

        The August 2013 denial letter, however, states that "no act
of any agent" or employee of plaintiff, including its *attorneys*,
"shall constitute a waiver or estoppel" and that plaintiff
reserves its defenses.  (Docket Entry # 28-10) (emphasis added).
The four-page letter quotes various provisions of the policy,

_____

[26]  To be clear, in adjudicating the summary judgment motion,
this court has considered all of the above evidence, including
the affidavits, and construed the record in plaintiff's favor in
denying the motion.

including the two-year limitations provision.  (Docket Entry #
28-10).  The July 30, 2014 letter devotes three paragraphs to
defendant's reservations of its rights, explicitly noting the
"limitations of action."  (Docket Entry # 28-15).  Like the
admonition in the August 2013 denial letter, the July 2014
letter states that all investigations undertaken by defendant
and its authorized representatives to investigate or attempt to
adjust any claim "shall not constitute a waiver" or an estoppel
of the terms, rights, and defenses under the policy.  (Docket
Entry # 28-15).  In the September 5, 2014 email to Quinby,
defendant's counsel states that "GNY would consider agreeing" to
a tolling agreement "so long as the tolling agreement does not
serve to *revive* any *expired statute of limitations*."  (Docket
Entry # 34-2) (emphasis added).  The parties entered into the
Tolling Agreement effective September 1, 2014, which excluded
the time thereafter until 30 days after defendant issued a
decision regarding the supplemental claim for exterior damage.
(Docket Entry # 28-13).  Defendant denied the claim for exterior
damage on November 17, 2016 and plaintiff filed suit 30 days
thereafter.  (Docket Entry # 28-14).

DISCUSSION

A.   Chapter 93A Claim

As previously noted, defendant contends that the chapter
93A claim is futile.  Beyond noting that the chapter 93A and

58

176D claims do not raise new factual issues and that it discussed all the supporting facts in the summary judgment papers, plaintiff does not address the futility of the chapter 93A claim.

Turning to the task, it is well settled that "[a]n insurance company which in good faith denies a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A." Lumbermens Mutual Cas. Co. v. Offices Unlimited, Inc., 645 N.E.2d 1165, 1169 (Mass. 1995) (also stating that "Lumbermens went beyond a mere plausible interpretation of the policy and denied coverage based on a legally correct interpretation of the policy"). Indeed, like the plaintiff in Lumbermens, defendant "went beyond a mere plausible interpretation of the policy and denied coverage based on a legally correct interpretation of the policy." Id. at 1169-1170.

Defendant had a viable and convincing reason to deny coverage on the basis that plaintiff did not file suit within two years of the time of the loss. "In such circumstances there are no facts" to "support a claim that" defendant "acted unfairly or deceptively." Lumbermens Mutual Cas. Co. v. Offices Unlimited, Inc., 645 N.E.2d at 1170 (adjudicating section 11 chapter 93A claim). The circumstances in the case at bar

therefore fall comfortably within the "general rule" that "an insurance company does not act unfairly or deceptively within the meaning of G.L. c. 93A, § 2, with respect to a claim made under a policy of insurance simply by making a legally correct disclaimer of coverage." Jet Line Services, Inc. v. Am. Employers Ins. Co., 537 N.E.2d 107, 114 (Mass. 1989).

Furthermore, defendant did not string plaintiff along or engage in deceptive conduct that gave the impression it would pay the claim. (Docket Entry # 28-8, p. 1) (Docket Entry # 28-9) (Docket Entry # 28-10, p. 4) (Docket Entry # 28-15, p. 3). It repeatedly informed plaintiff, Barrett, and/or Quinby that it reserved its right to deny coverage, including referring to the limitations of action and the two-year time period to commence an action. (Docket Entry ## 28-8, 28-9, 28-10) (Docket Entry # 28-15, p. 3) (Docket Entry # 34-2, p. 3). Substantial evidence of deceptive conduct or "'stringing out the process'" of the investigation is therefore decidedly absent. See Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802 F.3d at 54 (setting out at length the applicable section 11 standard in business context as including unfair settlement practices defined in chapter 176D, section three). Defendant did not unreasonably delay an investigation and accommodated plaintiff by entering in the Tolling Agreement. See House of Clean, Inc. v. St. Paul Fire and Marine Ins. Co., Inc., 775 F. Supp. 2d 296, 300 (D. Mass.

2011) (denying motion to amend complaint under plaintiff-friendly Fed. R. Civ. P. 12(b)(6) standard to include chapter 93A claim alleging that insurance company delayed coverage investigation for three years and failed to reimburse plaintiff for defense-related costs).  Defendant likewise did not engage in "nefarious leveraging conduct," Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802 F.3d at 55, or breach the insurance agreement, let alone commit a breach rising to the level of a section 11 chapter 93A violation.  See City of Revere v. Boston/Logan Airport Assocs., LLC, 416 F. Supp. 2d 200, 208-09 (D. Mass. 2005) ("a simple, or even intentional, breach is insufficient in itself to constitute an unfair or deceptive trade practice under Chapter 93A").  The document requests in July 2014 were reasonable in light of the asserted repair costs "estimated to be $7.75 million" by plaintiff in May 2014. (Docket Entry ## 28-12, 28-15).  In the context of the entire record, defendant acted fairly and did not engage in *any* actionable misrepresentation that would provide substantial evidence of a section 11 chapter 93A claim.  Coverage for the claim was never reasonably clear.  Rather, it was absent.

Defendant's conduct in its entirety as set out in the record does not rise to a "level of an 'extreme or egregious' business wrong" or other "similar level of 'rascality,' that raises 'an eyebrow of someone inured to the rough and tumble'"

world of commerce.  _Peabody Essex Museum, Inc. v. U.S. Fire Ins._
_Co._, 802 F.3d at 54.  Where, as here, substantial evidence does
not establish that defendant's conduct violates chapter 93A,
section 11, the proposed claim is futile.[27]  Finally, in making
this finding this court considered the chapter 176D violations
alleged in the proposed amended complaint and summarized above.
Substantial evidence in the record does not support a chapter
176D violation that could be used as probative evidence of a
section 11 chapter 93A claim.

B.   Chapter 176D Claim

     Defendant maintains that the chapter 176D claim is futile
because chapter 176D does not provide a separate cause of
action.  (Docket Entry # 38, p. 4) (citing _Silva v. Steadfast_
_Ins. Co._, 35 N.E.3d 401 (Mass. App. Ct. 2015)).  Plaintiff does
not address the argument.  _See_ _Curet-Velazquez v. ACEMLA de_
_Puerto Rico, Inc._, 656 F.3d at 54.

     The court in _Silva_ extensively discusses the relationship
between chapter 93A and chapter 176D.  _Silva v. Steadfast Ins._
_Co._, 35 N.E.3d at 405-404.  As explicitly stated by the court in
_Silva_, "To proceed against an insurer who has violated G.L. c.
176D, § 3(9), a plaintiff must bring a claim under G.L. c. 93A,
§ 9 or § 11."  _Id._ at 405.  Although a court may rely on a

_____

[27]  It is therefore not necessary to address defendant's other
arguments relative to the chapter 93A claim.

chapter 176D violation as evidence of an unfair business
practice for the purpose of a section 11 claim, liability
arises, if at all, under sections two and 11.  Id. at 405, 407-
408 (noting, in context of unfair settlement allegation in which
"liability has become reasonably clear" under chapter 176D,
section 3(9), "the question is whether Steadfast's failure to
make a postjudgment settlement offer constituted a violation of
G.L. c. 93A, §§ 2 and 11").  In contrast, section nine of
chapter 93A allows section nine consumer plaintiffs "to bring c.
93A claims alleging violations of c. 176D without regard to
whether those violations constitute an unfair business practice
under c. 93A, § 2."[28]  Id. at 406.  Hence, "while private
individuals bringing claims for unfair and deceptive acts and
practices under Mass. Gen. Laws ch. 93A, §§ 2 and 9 may recover
for violations of Mass. Gen. Laws ch. 176D, § 3(9), which
defines unfair claim settlement practices, business entities
such as [the plaintiff] may proceed only under ch. 93A, § 11."
Metropolitan Property & Casualty Ins. Co. v. Boston Regional
Physical Therapy, Inc., 538 F. Supp. 2d 338, 343 (D. Mass.
2008).

      As a section 11 business claimant, plaintiff therefore does
not have a separate cause of action for a chapter 176D

---

[28]  See footnote 22.

violation.  Rather, it must proceed under section 11.  As explained in the previous section, the chapter 93A claim, including the purported violations of section 176D in the proposed amended complaint, do not rise to a section 11 violation.  The chapter 176 "claim" is therefore futile.

CONCLUSION

In accordance with the foregoing discussion, defendant's motion to strike expert opinion (Docket Entry # 26) and motion for summary judgment (Docket Entry # 28) are **ALLOWED**. Plaintiff's motion for leave to amend complaint (Docket Entry # 36) is **DENIED.**

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge